**Jason M. SHOTS, Plaintiff–Appellee,**

**v.**

**CSX TRANSPORTATION, INCORPORATED, Defendant–Appellant.**

**No. 94–1290.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 7, 1994.

Decided Oct. 13, 1994.

David V. Scott, New Albany, IN (argued), for Jason M. Shots.

Victor L. Frost, II, Bruce A. Hugon (argued), Frost & Hugon, Indianapolis, IN, for CSX Transp., Inc.

William A. Brasher, Brasher Law Firm, St. Louis, MO, Stephen A. Trimble, Hamilton & Hamilton, Washington, DC, for Association of American Railroads, amicus curiae.

David W. Stone, IV, Anderson, IN, Daniel J. Harrigan, Bayliff, Harrigan, Cord & Maugans, Kokomo, IN, for Association of Trial Lawyers of America, amicus curiae.

Before POSNER, Chief Judge, and WELLFORD * and EASTERBROOK, Circuit Judges.

POSNER, Circuit Judge.

Jason Shots was injured when the car he was driving collided with a train operated by CSX at a grade crossing in Indiana in 1989. The crossing was equipped only with reflectorized cross-bucks—the familiar warning sign with two crossed arms implanted with plastic disks that reflect a vehicle's headlights at night. Shots brought a diversity tort suit against CSX, charging that the railroad had been negligent in failing to make the crossing safer—to equip it with an automatic gate and flashing-light signals or persuade the state or the municipality to do so. (A railroad grade crossing is the intersection of two rights of way—the railroad's, for the track, and the state or municipality's, for the highway or road that crosses the track—and we do not know which entity has the actual right or responsibility for the warning system.) The railroad interposed the defense that any attempt by the state through its common law or otherwise to regulate safety at this crossing was preempted by the Federal Railroad Safety Act of 1970, 45 U.S.C. §§ 421 *et seq.*, because the cross-bucks had been installed with federal financial assistance. The district judge rejected the defense but certified the question for interlocutory appeal under 28 U.S.C. § 1292(b), and we accepted the certification.

No previous case decides whether federal financial assistance alone preempts state regulation of crossing safety. In the wake of *CSX Transportation, Inc. v. Easterwood,* — U.S. —, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993), of which more anon, the Tenth Circuit in two cases has held that the financial assistance must be a "significant event" in some as yet not fully defined sense, *Armijo v. Atchison, Topeka & Santa Fe Ry.*, 19 F.3d 547, 550–51 (10th Cir.1994); see also *Hatfield v. Burlington Northern R.R.*, 1 F.3d 1071 (10th Cir.1993), but the cases do not explore the issues that arise once the threshold of establishing federal financial assistance has been crossed. The novelty of the issue presented by the present case—what if anything more must be shown besides federal financial assistance to knock out a state common law or statutory safety requirement for grade crossings—and its financial importance both to railroads and to tort plaintiffs and

* Hon. Harry W. Wellford of the Sixth Circuit.

their lawyers are shown by the filing of amicus briefs by the American Association of Railroads and the Association of Trial Lawyers of America.

The Federal Railroad Safety Act creates a scheme of comprehensive federal regulation of rail safety, including safety at grade crossings, but allows the states to "adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety until such time as the Secretary [of Transportation] has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement." 45 U.S.C. § 434. We must decide whether the Secretary has "cover[ed] the subject matter" of Indiana's common law of torts, so far as the absence of automatic gates and flashing-light signals at the crossing where Shots was injured is concerned, by a regulation which provides that "on any project where Federal-aid funds participate in the installation of" warning devices at grade crossings the devices must include "automatic gates with flashing light signals" if any one of a number of specified conditions is present. The conditions include "multiple main line railroad tracks," "a high volume of vehicular traffic," and "a diagnostic team recommends [automatic gates with flashing-light signals]." Even if one or more triggering conditions is present, "if a diagnostic team justifies that gates are not appropriate" the Secretary can waive them. 23 C.F.R. § 646.214(b)(3)(ii). If the requirements in subsection (3) (just quoted) for gates plus flashing lights are not satisfied, "the type of warning device to be installed, whether the determination is made by a State regulatory agency, State highway agency, and/or the railroad, is subject to the approval of" the Secretary. 23 C.F.R. § 646.214(b)(4). The railroad deems subsection (4) applicable and argues that the Secretary approved, or at least should be deemed to have approved, the reflectorized cross-bucks at the crossing where Shots was injured. If this is right, the state cannot require greater or different precautions at the crossing.

The regulation, although subject to the preemption provision of the Federal Railroad Safety Act of 1970, *CSX Transportation, Inc. v. Easterwood, supra,* —— U.S. at ——, 113 S.Ct. at 1737 n. 4, was actually promulgated under the authority of a later statute, the Highway Safety Act of 1973, 23 U.S.C. §§ 101 *et seq.* A follow-on to the Federal Railroad Safety Act, the Highway Safety Act offered federal money for the installation of grade-crossing safety devices to states that would undertake to identify those crossings that might require such devices and to "establish and implement a schedule of projects for this purpose"; hence the need for the diagnostic teams, ordinarily made up of state and railroad safety engineers, to which the regulation refers. 23 U.S.C. § 130(d).

Pursuant to the Highway Safety Act, the State of Indiana made an agreement with the predecessor of CSX in 1975 to "upgrade the passive protection at the Railroad's public rail-highway crossings in Indiana to minimum standards, as established by the State." The agreement covers 2,638 highway crossings and requires the railroad to install (largely at the expense of the state, which is to say of the federal government) reflectorized cross-bucks at all crossings that do not have them and to replace "nonstandard" with standard reflectorized cross-bucks at other crossings. All the new cross-bucks were to be supplied by the state at no charge to the railroad. The agreement was approved by the Secretary of Transportation only five days after regulation 646.214 went into effect, and without a recommendation by a diagnostic team. The crossing at which Shots was injured was one of the crossings at which, pursuant to the agreement, reflectorized cross-bucks were installed. Since this occurred long before the accident took place, and since federal funds "participated" in the installation, the railroad argues that the regulation clicks in and any argument that it was negligent not to have gates and flashing lights is precluded by the preemption provision in the 1970 Act.

The Supreme Court's opinion in *Easterwood* cites the regulation and states with reference to it that "for projects in which federal funds participate in the installation of warning devices, the Secretary has determined the devices to be installed and the means by which railroads are to participate

in their selection. The Secretary's regulations therefore cover the subject matter." —— U.S. at ——, 113 S.Ct. at 1741. Read literally, as a blanket statement that the regulation prescribes *the* safety devices for all crossings at which federal funds have been used for the installation of some safety device, this passage supports the railroad's position. But we do not think that the literal reading is the correct one. The regulation does not specify particular safety devices at particular crossings. Rather, it establishes criteria for determining which safety devices are required at particular crossings. Because the Supreme Court in *Easterwood* found that federal funds had not participated in the project at issue in the case, it had no occasion to consider the application of the regulation to particular crossings. Similarly, in the two Tenth Circuit decisions that we cited, the issue was whether the regulation was applicable by virtue of federal financial participation, not whether the regulation, if applicable, actually prescribed a particular safety device at a particular crossing.

The general thrust of the provision of the Federal Railroad Safety Act on preemption is clear enough. If the Secretary promulgates a regulation that covers the subject matter of some state safety requirement, the state requirement must give way (with an inapplicable exception) even if there is no direct conflict, that is, even if the federal and state requirements would not place the railroad under conflicting duties. If the state fixes a speed limit of 50 m.p.h. and the Secretary of Transportation a speed limit of 60 m.p.h. the state limit is nullified, even though the railroad could comply with both the state and the federal requirement by not exceeding 50 m.p.h. *Id.* at ——, 113 S.Ct. at 1742–44; see also *Watson v. Rail Link, Inc.*, 826 F.Supp. 487, 490 (S.D.Ga.1993). The Secretary was to have the whip hand in specifying safety standards in the railroad industry; the preemption provision itself refers, in a sentence that we did not quote, to the goal of achieving so far as possible national uniformity in those standards. So if the Secretary had prescribed cross-bucks for the crossing at which Shots was injured, Shots could not argue that the common law of Indiana required the railroad to install automatic gates and flashing-light signals. The regulation would have covered the subject matter of highway safety at that crossing.

The Secretary has not prescribed cross-bucks or anything else at the crossing in question, however, and we do not understand the railroad to be arguing, by analogy to cases like *Bethlehem Steel Co. v. New York State Labor Relations Bd.*, 330 U.S. 767, 774–75, 67 S.Ct. 1026, 1030–31, 91 L.Ed. 1234 (1947), that the Federal Railroad Safety Act gives federal inaction preemptive effect. There is, of course, the regulation; if it can be read, either by itself or in conjunction with the agreement between the state and the railroad, as prescribing the safety devices for the crossing at which Shots was injured, then the Secretary has covered the relevant subject matter and the railroad has a good defense to Shots's suit. There is—we believe the railroad would agree—no such prescription in the regulation when it is read apart from the agreement. The regulation, as we said earlier, prescribes criteria for selecting safety devices rather than the devices themselves. Subsection (3) requires gates and flashing lights if any of the conditions specified in that subsection exist, unless a diagnostic team recommends against them and the Secretary concurs. There is no indication whether any of the conditions in subsection (3) has ever been fulfilled at the crossing where Shots was injured. Perhaps one or more has been; if so, and if the railroad was in violation of the regulation when he was hurt, then instead of the railroad's using the regulation defensively Shots should be using it offensively. Well, he isn't trying to use it offensively, so we can dismiss the possibility that subsection (3) required gates at this particular crossing and turn to subsection (4). While that provision would not of its own force require the installation of gates and flashing lights, the type of warning device to be installed would be subject to the Secretary's approval, and the Secretary has never expressed his approval of cross-bucks or of any other specific warning device at this crossing. For all that appears, if consulted he would have insisted on automatic gates and flashing-light signals. He was not con-

sulted, and did not approve cross-bucks—unless he should be deemed to have approved them by approving the 1975 agreement between the railroad and the state.

█ We do not doubt that the Secretary can approve a warning device before or after its installation or that he can make wholesale as well as retail approvals. We may assume as well that he can act through state safety officials as his delegates. We do not think that the fact that the approval of the agreement with the railroad came so hard on the heels of the adoption of the regulation means that the approval could not have been intended to implement the regulation; indeed, we do not think it appropriate to explore the subjective understandings of the signators. We also agree with the railroad—this is actually a related point—that the preemptive effect of a safety requirement laid down by the Secretary cannot be challenged in a tort suit by arguing to the court that he made a mistake—that he should have imposed a more stringent requirement, or that he should not have acted before hearing the recommendations of a diagnostic team. To allow that sort of collateral challenge to the Secretary's action would put the railroad in an impossible position. It could hardly be asked to challenge the Secretary's specification of the safety devices required at its grade crossings as too lax, and yet if it did not it would be required by law to comply with the specification, thus exposing itself to suit if a tort plaintiff is free to second-guess the Secretary's specification. It is true that if a regulator exceeds his statutory authority or acts arbitrarily, as distinct from making an ill-judged or uninformed or debatable choice, his regulation will not be given preemptive effect. *Fidelity Federal Savings & Loan Ass'n v. De la Cuesta,* 458 U.S. 141, 153–54, 102 S.Ct. 3014, 3022–23, 73 L.Ed.2d 664 (1982); *Ridgway v. Ridgway,* 454 U.S. 46, 57, 102 S.Ct. 49, 56, 70 L.Ed.2d 39 (1981); *Larsen v. Pacesetter Systems, Inc.,* 74 Haw. 1, 837 P.2d 1273, 1281 (1992); *Toolan v. Trevose Federal Savings & Loan Ass'n,* 501 Pa. 477, 462 A.2d 224, 227 (1983). But that is a far cry from anything that could be argued here.

All this does not excuse us from having to *interpret* the agreement, for it is the only evidence of any requirement imposed by the Secretary with respect to the grade crossing at which Shots was injured. We must decide whether, read with the regulation, it constitutes a determination of what warning devices should be required at the thousands of crossings covered by the agreement. If the Secretary has not made a determination—and he has not, unless by approving the agreement—that all these crossings would be adequately protected by reflectorized cross-bucks, then the agreement, viewed as a kind of order or regulation by the Secretary, cannot be thought to have covered the subject matter of safety at Indiana grade crossings. To repeat, the regulation itself, although concerned with safety at all crossings, does not prescribe the safety devices at any; rather, it establishes criteria to which the prescriptions, made later, must conform.

The agreement is limited in scope to "passive" warning devices, a term that excludes gates and flashing lights. 23 C.F.R. §§ 646.204(i), (j). The word "scope" deserves emphasis. The agreement does not state or imply that the thousands of crossings covered by it would be adequately safe if equipped with reflectorized cross-bucks. The point is rather that these are the only form of safety device that the agreement covers. This limitation of scope is reinforced by the fact that the agreement is explicitly limited to providing the "minimum" in passive protections—the minimum being standard reflectorized cross-bucks for crossings, such as the one in question in this case, that lacked even that much in the way of a warning device. Minimum is not a synonym for optimum, or even adequate. We must not forget the context of the agreement. The State of Indiana had thousands of substandard crossings, and limited funds, even with federal largesse, to bring them all up to the optimal standard of safety. The task was to maximize grade-crossing safety in the state as a whole, subject to a budget constraint, so it was to be expected that adequate safety might be sacrificed at some crossings to enable minimum safety to be achieved at all. So far as can be gathered from the record compiled in the district court, the agreement

was a step on the road to adequate safety rather than a determination by the State of Indiana or the federal Secretary of Transportation as to what safety devices would be adequate at each of the thousands of crossings covered by it.

Thus we do not think it can be realistically said, to use the formulation in *Easterwood,* that "the Secretary has determined the devices to be installed" at these crossings merely because he authorized federal funds to bring them up to minimum standards, utilizing passive warning devices solely. Indeed, it would have been an extraordinary act of irresponsibility for the Secretary of Transportation, by approving the agreement, to preclude tort liability for the railroad's failing to have active warning devices at any of the thousands of crossings covered by the agreement, or otherwise to prevent the state from requiring adequate safety devices at the busiest or most dangerous of these crossings, when no one in the federal government had made a determination that the improvements to be made would bring all the crossings up to a level of safety adequate to satisfy federal standards.

AFFIRMED.