**Linda THIELE, Guardian of the Person and Estate of Craig Thiele, an Incompetent, Plaintiff,**

v.

**NORFOLK AND WESTERN RAILWAY COMPANY, Defendant.**

**Civ. No. 1:94cv60.**

United States District Court, N.D. Indiana, Fort Wayne Division.

Dec. 15, 1994.

As Amended Dec. 20, 1994.

G. Stanley Hood, Roby and Hood, Fort Wayne, IN, Robert A. Clifford, Robert A. Clifford & Associates, J. Matthew Dudley, Corboy Demetrio Clifford, P.C., Chicago, IL, for plaintiff.

John C. Duffey, Russell H. Hart, Stuart and Branigin, Lafayette, IN, for defendant.

## ORDER

WILLIAM C. LEE, District Judge:

This matter is before the court on a motion for summary judgment filed by the defendant, Norfolk and Western Railway Company ("N & W"), on August 22, 1994. The parties completed briefing the motion on December 1, 1994. For the following reasons, summary judgment will be granted.

### Summary Judgment

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. *Fitzpatrick v. Catholic Bishop*

*of Chicago,* 916 F.2d 1254, 1256 (7th Cir. 1990). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id. In Re Matter of Wildman,* 859 F.2d 553, 557 (7th Cir.1988); *Klein v. Ryan,* 847 F.2d 368, 374 (7th Cir.1988); *Valentine v. Joliet Township High School District No. 204,* 802 F.2d 981, 986 (7th Cir.1986). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." *Juarez v. Ameritech Mobile Communications, Inc.,* 957 F.2d 317, 322 (7th Cir.1992) (quoting *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

■ Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact," *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. *Goka v. Bobbitt,* 862 F.2d 646, 649 (7th Cir.1988); *Guenin v. Sendra Corp.,* 700 F.Supp. 973, 974 (N.D.Ind.1988); *Posey v. Skyline Corp.,* 702 F.2d 102, 105 (7th Cir.), *cert. denied,* 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983).

■ So that the district court may readily determine whether genuine issues of material fact exist, under Local Rule 56.1, the moving party is obligated to file with the court a "Statement of Material Facts" supported by appropriate citation to the record to which the moving party contends no genuine issues exist. In addition, the non-movant is obligated to file with the court a "Statement of Genuine Issues" supported by appropriate citation to the record outlining all material facts to which the non-movant contends exist that must be litigated. *See, Waldridge v. American Hoechst Corp. et al.,* 24 F.3d 918 (7th Cir.1994). In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. *Anderson,* 477 U.S. at 249–251, 106 S.Ct. at 2511. Furthermore, in determining the motion for summary judgment, the court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent that such facts are controverted in the "Statement of Genuine Issues" filed in opposition to the motion. L.R. 56.1.

■ Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Id.* The issue of fact must be genuine. Fed.R.Civ.P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356; *First National Bank of Cicero v. Lewco Securities Corp.,* 860 F.2d 1407, 1411 (7th Cir.1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Id.* A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-

sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–252, 106 S.Ct. at 2512. Finally, the court notes that, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate. *Mason v. Continental Illinois Nat'l Bank*, 704 F.2d 361, 367 (7th Cir.1983).

### Discussion

Plaintiff Linda Thiele ("Thiele"), filed a personal injury action against N & W on February 28, 1994. Thiele is suing on behalf of her son and ward, Craig Thiele, who was injured on March 6, 1992, when N & W's train ("train # 443") struck the left side of his vehicle as it crossed a railroad intersection in Yoder, Indiana. Thiele alleges that N & W is liable for four acts of negligence: (1) failing to install and maintain adequate grade crossing warning devices; (2) installing and failing to remove a signal box which allegedly obstructed the view of eastbound motorists for southbound trains; (3) failing to sound the train's horn, keep a safe lookout, and operate the train at a reasonable speed; and (4) willfully and wantonly failing to modify the grade crossing warning devices after becoming aware of their inadequate nature.

In support of its motion for summary judgment, N & W argues that the majority of Thiele's claims are preempted by federal law, specifically the Federal Railroad Safety Act of 1970 (FRSA), as amended, 45 U.S.C. §§ 421–447, and the regulations promulgated thereunder.

The FRSA was enacted in 1970 "to promote safety in all areas of railroad operations and to reduce railroad-related accidents and to reduce deaths and injuries to persons...." 45 U.S.C. § 421. To further the purposes of the FRSA, the Secretary of Transportation has promulgated numerous regulations governing railroad safety. Section 434 of the FRSA contains express preemption clauses[1]. Thus, states may not adopt safety standards (either statutory or common-law) if the subject matter of those standards are covered by federal law.

In the present case, it is undisputed that the stretch of track on which train # 443 was traveling at the time of the accident had a federally prescribed maximum speed limit of 60 miles an hour. It is also undisputed that train # 443 was traveling at approximately 41 miles per hour as it approached the Yoder Road crossing. N & W relies on the United States Supreme Court's decision in *CSX Transp., Inc. v. Easterwood*, —— U.S. ——, —— – ——, 113 S.Ct. 1732, 1743–44, 123 L.Ed.2d 387 (1993), in support of its argument that a plaintiff's negligence claim based upon a train's alleged excessive speed is preempted by federal law where the train, at the time of the accident, was travelling at or below the federally prescribed speed limit for the particular class of track involved. In *Easterwood*, the Supreme Court clearly held that excessive speed claims are preempted by federal law when the train was not exceeding the federally prescribed speed limit at the time of the accident. —— U.S. at —— – ——, 113 S.Ct. at 1743–44. In fact, Thiele has admitted in her response that her claims based upon excessive speed are preempted as a result of the Supreme Court's ruling in *Easterwood*. Consequently, this court will grant summary judgment in favor of N & W on Thiele's excessive speed claim.

N & W also contends that Thiele's claim that N & W had inadequate warning devices is likewise preempted because, at the time of the accident, the Yoder Road crossing was the subject of a federally funded and approved grade crossing improvement project. The facts regarding this federally funded project are as follows.

1. Section 434 reads:

   The Congress declares that laws, rules, regulations, orders, and standards relating to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety until such time as the Secretary has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement. A State may adopt or continue in force an additional or more stringent law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal Law, rule, regulation, order, or standard, and when not creating an undue burden on interstate commerce.

By an agreement dated July 30, 1991, and fully executed on October 8, 1991, between N & W, Allen County, and the State of Indiana, N & W was to install active grade crossing warning devices (*i.e.*, flashers and gates) at the Yoder Road grade crossing. Pursuant to this agreement, all "plans, diagrams and estimates [for the crossing improvements were] subject to approval by the State and the Federal Highway Administration. . . ." Because "the installation [of the] grade crossing warning devices [was] found to be of no ascertainable net benefit to [N & W]," N & W was not required to pay any of the crossing improvement costs. Rather, the project was to be financed 90% with federal funds, with the remaining 10% to be paid by Allen County.

Pursuant to the terms of the Agreement, N & W was "not [to] commence any of the work [for the crossing improvement] until notified in writing by the State to proceed. . . ." On October 30, 1991, the Indiana Department of Transportation requested approval from the Federal Highway Administration ("FHWA") to proceed with the Yoder Road crossing improvement project; such approval was granted on November 19, 1991. Thereafter, on December 11, 1991, N & W was notified to proceed with the construction and installation of the active grade crossing warning devices. N & W ordered the necessary materials, scheduled the work, and began the project shortly before Craig Thiele's accident.

On the date of Craig Thiele's accident, N & W had completed part of the Yoder Road project. The signal control box had been installed in the northwest corner of the crossing, and the steel masts, with crossbucks but without flasher lights, had also been erected. This work was completed and placed in service on April 20, 1992 and approved by the State on September 14, 1992.

N & W argues that *Easterwood, supra,* precisely held that the participation of federal funds in the upgrading of warning devices at a rail-highway grade crossing, or subjecting such project to approval by the FHWA, results in the preemption of any claims based upon State law that a railroad should have nonetheless installed additional or different warning devices at a particular grade crossing.

*Easterwood* involved a grade crossing accident at a railroad crossing in Georgia. Plaintiff's decedent brought suit alleging, *inter alia,* inadequate warning devices. In discussing preemption, the Supreme Court stated:

> Thus, the issue before the Court is whether the Secretary of Transportation has issued regulations covering the same subject matter as Georgia negligence law pertaining to the maintenance of, and the operation of trains at, grade crossings. To prevail on the claim that the regulations have pre-emptive effect, petitioner must establish more than that they "touch upon" or "relate to" that subject matter, cf. *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, ——, 112 S.Ct. 2031, 2037, 119 L.Ed.2d 157 (1992) (statute's use of "relating to" confers broad pre-emptive effect), for "covering" is a more restrictive term which indicates that pre-emption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law. . . . The term "covering" is in turn employed within a provision that displays considerable solicitude for state law in that its express pre-emption clause is both prefaced and succeeded by express saving clauses.

—— U.S. at ——, 113 S.Ct. at 1738.

The *Easterwood* court then discussed the federal regulations regarding improvements of grade crossings and set forth the analysis to be made when determining whether the regulations preempt a specific state negligence claim. The Court summarized its holding as follows:

> In short, for projects in which federal funds participate in the installation of warning devices, the Secretary has determined the devices to be installed and the means by which railroads are to participate in their selection. The Secretary's regulations therefore cover the subject matter of state law which, like the tort law on which respondent relies, seeks to impose an independent duty on a railroad to identify and/or repair dangerous crossings.

*Id.* at ——, 113 S.Ct. at 1741. The Court then determined that the plaintiff's negligence claim was not preempted because the facts did not establish that federal funds participated in the installation of the warning devices at the intersection in question. The facts in *Easterwood* established that although federal funding was initially approved to install a crossing gate at the intersection, and a motion detector circuit was actually installed, the plan to install the gate was later shelved and the funds were diverted to another project.

This court must now determine whether the Secretary has "covered the subject matter of state law", which state law Thiele relies upon to recover from N & W.

N & W relies heavily on a recent decision of the Seventh Circuit Court of Appeals, *Shots v. CSX Transp. Inc.,* 38 F.3d 304 (7th Cir.1994). In *Shots,* the plaintiff was injured at a railroad crossing that was equipped only with reflectorized cross-bucks. The plaintiff sued the railroad, alleging that the railroad had been negligent in failing to make the crossing safer by equipping it with an automatic gate and flashing-light signals. The railroad claimed that the plaintiff's suit was preempted by federal law because the cross-bucks had been installed with federal financial assistance. On appeal, the Seventh Circuit explored the issue of what, if anything, must be shown beyond federal financial assistance to preempt a state law claim.

In *Shots,* the Court noted that although the cross-bucks had been installed with federal funds, the Secretary had not prescribed the cross-bucks (or any other warning device) at the crossing at which the plaintiff was injured. *Id.* at 307. The Court thus found that the Secretary had not "covered the relevant subject matter" and, therefore, the Secretary's regulations did not preempt the plaintiff's state law claim. In reaching this conclusion, the Court stated:

> So if the Secretary had prescribed cross-bucks for the crossing at which Shots was injured, Shots could not argue that the common law of Indiana required the railroad to install automatic gates and flashing-light signals. The regulation would have covered the subject matter of highway safety at that crossing.... [I]f [the regulation] can be read, either by itself or in conjunction with the agreement between the state and the railroad, as prescribing the safety devices for the crossing at which Shots was injured, then the Secretary has covered the relevant subject matter and the railroad has a good defense to Shots's suit.... While [subsection (4) of the regulation] would not of its own force require the installation of gates and flashing lights, the type of warning device to be installed would be subject to the Secretary's approval, and the Secretary has never expressed his approval of cross-bucks or of any other specific warning device at this crossing.

*Id.* at 307.

From this language, N & W crafts the argument that since the Secretary did in fact approve flashing lights and gates at the Yoder Road crossing, the Secretary's regulations "covered" the relevant subject matter, and Thiele's negligence claim is preempted.

The parties also contend that the question of whether the Secretary's regulations preempt Thiele's state law claims depends on whether "federal funds participated in the installation of the warning devices" at the Yoder Road crossing. N & W argues that the participation of federal funds occurred when federal *approval* for the installation of the warning devices had been obtained, *i.e.,* on November 19, 1991. Thiele, however, argues that the participation of federal funds did not occur until the *installation* of the warning devices was *complete, i.e.,* on April 20, 1992, approximately a month and a half after Craig Thiele's accident.

A recent case from the Eighth Circuit, *St. Louis Southwestern Railway Co. v. Malone Freight Lines, Inc.,* 39 F.3d 864 (8th Cir. 1994), supports Thiele's argument. In *Malone,* the plaintiff, whose husband was killed at a train crossing on an Arkansas highway, sued the railroad for negligence in failing to provide adequate warning devices at the crossing and in failing to use reasonable diligence in implementing a federally approved upgrade plan at the crossing. The district court granted the railroad's motion for summary judgment, holding that the negligence

claims were preempted by federal law when the FHWA approved the upgrade plan.

The Eighth Circuit reversed, finding that the negligence claims were not preempted because the approved warning devices had not been finally installed at the time of the accident. The Eighth Circuit stated:

The view that federal funds participate in installation when the FHA approves upgrade plans is contrary to *Easterwood.* Before the accident in *Easterwood*, federal funds had been allocated for the gate, and thus, the FHA had approved the upgrade plan. *See* 23 C.F.R. § 646.216(e)(1993). Rather than looking to federal approval or fund allocation as triggering preemption, the Supreme Court focused on the equipment installed at the crossing. Because the only equipment installed was circuitry, which was not a passive or active warning device as defined in 23 C.F.R. § 646.204(i)–(j), the Court held the claim was not preempted. *Easterwood,* —— U.S. at ——–——, 113 S.Ct. at 1741–42.

\*    \*    \*    \*    \*    \*

The view that preemption runs from the time of federal approval is inconsistent with the FRSA's goal of promoting safety at railroad crossings. *See Easterwood,* [—— U.S. at ——] 113 S.Ct. at 1736. Before preemption, the public is protected by a railroad's state common-law duty of care. After installation of federally mandated warning devices, the public is protected by those devices. A plan to install devices and federal approval of a plan do not protect the public, however. The Railway's interpretation that federal approval triggers preemption would leave the public unprotected between the time of approval and the time the prescribed devices are installed and operating. This can be a substantial period of time. In this case, it was fifteen months. To encourage prompt installation of federally prescribed warning devices, a railroad's common-law duty of care must continue until those devices are installed.

Under *Easterwood,* the regulations, and the public safety policy behind the FRSA, we hold preemption occurs when all the devices prescribed in the FHA-approved upgrade plan are installed and operating. *Id.,* 39 F.3d at 867.

This court finds that the Eighth Circuit's holding in *Malone* is inconsistent with the Seventh Circuit's holding in *Shots.* In *Shots,* the Seventh Circuit looked at whether the warning devices had been prescribed by the Secretary, thereby bringing the federal regulations into play which, in turn, trigger preemption of state law. In *Shots,* the warning device (reflectorized cross-bucks) had been completely installed long before Shots was killed at the crossing. However, the Secretary had not *prescribed* the warning device, but had merely approved the agreement between the railroad and the state, thus preemption did not occur even though the device was approved and completely installed, and federal funds had participated in the installation.

In the present case, Thiele does not argue that the Secretary did not prescribe the warning devices to be installed at the Yoder Road crossing. Rather, Thiele specifically states that "the decision of the Secretary was to install active warning devices." See Response Brief at p. 9. According to *Shots,* when the Secretary prescribed the specific warning devices, the regulations then "covered the relevant subject matter" and preemption occurred.

This court will follow *Shots,* and not *Malone.* Besides being inconsistent with *Shots,* the *Malone* decision suffers from several analytical deficiencies. First, the *Malone* Court read *Easterwood* too narrowly when it held that, because the Supreme Court focused on the equipment that was installed at the crossing, it is necessarily the complete installation of the prescribed warning device that triggers preemption. Although the Supreme Court in *Easterwood* noted that the only equipment installed at the crossing at issue was circuitry, which was not a passive or active warning device, the Supreme Court clearly based its decision on the fact that the project to install warning devices was completely abandoned. Although the Secretary had determined the devices to be installed, federal funding for the devices was transferred to another project, thus, federal funds

did not participate in the installation of warning devices at the crossing.

Moreover, the *Malone* Court's focus on the word "installation" as meaning "complete installation" is unreasonable. As noted earlier, in *Easterwood* the Supreme Court held that:

"In short, for projects in which federal funds participate in the installation of warning devices, the Secretary has determined the devices *to be installed* and the means by which railroads are to participate in their selection. The Secretary's regulations therefore cover the subject matter of state law...." (Emphasis added)

*Easterwood,* —— U.S. at ——, 113 S.Ct. at 1741.

■■■ This language clearly supports the Seventh Circuit's holding in *Shots* that it is the Secretary's determination of the devices to be installed, not the completion of the installation itself, that triggers preemption. Additionally, the dictionary definition of "installation" is as follows: "an act of installing or the state of being installed". *Webster's Third New International Dictionary* 1171 (Unabridged ed. 1986). Thus, it is clear that federal funds are "participating in the installation" of a project during the actual installation of the prescribed devices and not only after the installation has been fully completed. Consequently, this court finds that the federal regulations covered the subject matter on the date of Craig Thiele's accident and Thiele's claim of inadequate warning devices is preempted.

This court notes that, contrary to the *Malone* Court's belief, this interpretation does not leave the public without an avenue of redress for injuries that occur between the time of approval and the time the prescribed devices are installed and operating. As N & W has pointed out, the "Agreement Covering Installation of Highway–Railway Grade Crossing Warning Devices" specifically provided that "any watchmen or flagmen necessary to protect or safeguard highway traffic shall be provided by the County at its own cost. Any necessary closure of the highway to traffic during the progress of the work shall be made only with the approval of the County." Agreement at ¶ 7. Additionally, N

& W was solely responsible for the maintenance of railway traffic during the progress of the work and was required to furnish necessary railroad personnel to safeguard its own operations. *Id.* Thus, it was Allen County's duty to take precautions to protect the motoring public during the construction of the crossing upgrade, and the public was not left without recourse in the event an accident occurred during the construction of the crossing improvement.

■■■ Likewise, the court finds that Thiele's claim that the railroad negligently obstructed Craig Thiele's view by installing a signal box near the crossing is preempted. It is undisputed that the signal box was installed as part of the installation of the prescribed warning devices and were installed in accordance with federally funded and approved plans and specifications. As the Secretary had determined that this device was to be installed, the federal regulations covered the subject matter and all claims relating thereto are preempted.

Finally, N & W argues that Thiele's claim that train # 443 was negligently operated fails as a matter of law because the claim is unsupported by any competent evidence. N & W claims that the undisputed facts demonstrate that N & W's train crew, by sounding the statutorily required crossing warning whistle, complied, as a matter of law, with its legal duties respecting all persons traversing the grade crossing. In response to N & W's argument. Thiele asserts that there is a dispute as to whether N & W's engineer sounded any "short blasts" of the whistle just prior to the collision. In reply, N & W claims that there is no genuine dispute in the testimony of the witnesses and, moreover, there is no evidence that this alleged failure to act was a proximate cause of the accident.

Thiele claims that Mr. Williams, a conductor on the second locomotive unit, presented testimony that contradicts the testimony of Mr. Pursiful, a student engineer/fireman who was on the lead locomotive unit and who testified that just before impact the engineer gave several short blasts of the whistle. Mr. Williams' testimony is as follows:

Q. Do you remember if on the 6th, did you hear a whistle that day?

A. Yes.

Q. Tell me what you heard. Did you hear two longs, a short?

A. Yes, you start at that whistle post with two longs, a short, then a long. We just heard the whistle blow, that's all. It is just something that is automatic in your ear.

Q. Did you hear any difference in the whistle on that day?

A. I can't truthfully answer that.

Q. So it just sounded like the whistle was—

A. Normal.

Q. Normal?

A. Yes.

Williams Dep. at p. 24.

■ The court agrees with N & W that Thiele has not established the existence of a *genuine* issue of material fact. Clearly, Thiele has not presented evidence on which a jury could reasonably find that the train crew failed to sound short blasts of the whistle just prior to the accident. Williams explicitly admitted in his deposition that he could not truthfully state on the record what the whistle sounded like. Moreover, there is a substantial body of testimony in this case that as train # 443 approached the Yoder Road crossing, it repeatedly sounded a very audible whistle warning. *See* Depositions of Gehrang, Hostetter, Reed, Hayden, and Springer.

■ Additionally, this court agrees with N & W that Thiele has failed to present any facts in support of her claim that the alleged failure to sound short blasts of the whistle in the last two-three seconds before impact was a proximate cause of the accident. That is, Thiele has not presented any facts suggesting that if the train crew had sounded short blasts of the whistle immediately before impact, Craig Thiele would have been able to get his vehicle off of the track in time to avoid injury. Consequently, this court will grant summary judgment in favor of N & W on Thiele's claim that train # 443 was negligently operated.

As an alternative basis for summary judgment N & W argues that the sole proximate cause of the accident on March 6, 1992, was the fault of Craig Thiele or, at the least, that Craig Thiele's fault was greater than the fault of N & W, thereby precluding any recovery by Thiele in this action.

■ Under the Indiana Comparative Fault Act, a plaintiff is barred from recovery, as a matter of law, if his contributory fault is greater than the fault of all persons whose fault contributed to his damages. *Ind.Code* § 34–4–33–4. "Fault apportionment under the Indiana Comparative Fault Act is uniquely a question of fact to be decided by the jury." *McKinney v. Public Service Co.,* 597 N.E.2d 1001, 1008 (Ind.App.1992). However, "at some point the apportionment of fault may become a question of law for the court." *Robbins v. McCarthy,* 581 N.E.2d 929, 934 (Ind.App.1991). "But that point is reached only when there is no dispute in the evidence and the factfinder is able to come to only one logical conclusion." *Id.*

■ N & W claims that reasonable persons cannot disagree about the overwhelming nature of Craig Thiele's fault. N & W points out that the approaching train was clearly visible and audible, and was in hazardous proximity to the crossing. Nevertheless, Craig Thiele, in violation of Indiana law, stopped his vehicle on N & W's main-line tracks, where he was struck by train # 443. N & W further points out that post-accident witnesses confirmed that the gear-shift lever of Craig Thiele's vehicle was in the "park" position after the accident. N & W concludes that Craig Thiele clearly violated his duty to exercise reasonable care for his own safety and his statutory duties to stop prior to the crossing when warned of a train's approach and when such crossing was protected by a stop sign.

Thiele has not presented any evidence on the issue of whether Craig Thiele used due care in approaching the crossing. Thiele's one-page response merely states that the engineer, Dave Huff, stated in his deposition that the purpose of having gates at the crossing is to block the crossing so that motorists cannot proceed into the crossing. Huff also

stated that the purpose of flashing lights is to warn motorists of an approaching train. The issue before the court, however, is not whether the accident could have possibly been prevented with the use of more extensive warning devices. The issue is whether Craig Thiele was more than 50% negligent in causing the accident. The undisputed evidence shows that Craig Thiele failed to stop prior to attempting to cross the railroad tracks, even though a stop sign was prominently placed before the crossing. The undisputed evidence also shows that Craig Thiele disregarded train # 443's warning whistle, attempted to cross the tracks, and then stopped his vehicle on the tracks. Based on this undisputed evidence, the court finds, as a matter of law, that a reasonable jury could come to only one logical conclusion: that Craig Thiele's fault was greater than the fault of N & W. Consequently, this court will grant summary judgment in favor of N & W on all of Thiele's claims.

### Conclusion

For all the foregoing reasons, N & W's motion for summary judgment is hereby GRANTED.