United States Court of Appeals,

Eleventh Circuit.

No. 97-6078.

Angela Suzanne INGRAM, individually and as Custodial Parent of Zachary James Glass, a deceased minor;  Thomas H. Trammell, Plaintiffs-Appellants,

v.

CSX TRANSPORTATION, INC., a corporation;  Albertville, City of, Defendants-Appellees.

July 16, 1998.

Appeal from the United States District Court for the Northern District of Alabama. (No. CV-95-AR-1314-M), William M. Acker, Jr., Judge.

Before HATCHETT, Chief Judge, and FAY and FARRIS[*], Senior Circuit Judges.

HATCHETT, Chief Judge:

Angela Ingram suffered injuries and her ten-year-old son, Zachary Glass, died when the car Ingram was driving collided with a train at a railroad crossing in Albertville, Alabama.  Ingram, individually and on behalf of Zachary, filed the present state law negligence action against the City of Albertville (the City), which owned and operated the railroad crossing, and CSX Transportation, Inc. (CSX), which owned and operated the train and railroad tracks.[1]  Ingram's complaint alleged that the warning devices at the railroad crossing were inadequate.  The district court granted summary judgment in favor of the City and CSX, finding the Federal Railroad Safety Act of 1970 (FRSA), as amended, 49 U.S.C.A. §§ 20101 *et seq.* (West 1997 & Supp.1998), and accompanying federal grade crossing regulations, 23 C.F.R. §§ 646.214(b)(3) and (4) (1997) preempted the claim.

---

[*]Honorable Jerome Farris, Senior U.S. Circuit Judge for the Ninth Circuit, sitting by designation.

[1]Ingram's father, Thomas Trammell, owned the car that Ingram was driving and is also a plaintiff-appellant in this lawsuit.

We affirm.

## I. BACKGROUND

The accident giving rise to this lawsuit occurred shortly after 5 p.m. on January 10, 1995, as Ingram, traveling down McKinney Avenue with Zachary, her oldest son, in the front passenger seat, was on her way to a child day care center to pick up her youngest son. Although Ingram had often taken this route and knew that it required her to cross CSX's railroad tracks, she had never before seen a train at the crossing.

Advance warning signs, such as no-passing zone signs and crossbucks, preceded the McKinney crossing on each approach. These passive warning devices had been installed pursuant to appropriations of funds from the Federal Highway Administration. No active warning devices, such as flashing lights and gates, preceded the intersection.

Before reaching the crossing, Ingram slowed down to 25 miles per hour, but does not recall whether she stopped. She looked both ways and saw no oncoming train. A building and fence to her right may have obstructed her view, as well as cars traveling on Railroad Avenue, which runs perpendicular to McKinney Avenue and parallel to the railroad tracks. As Ingram proceeded across the tracks, a CSX train struck her car.

In April 1995, Ingram, an Alabama resident, filed this lawsuit in the Circuit Court of Marshall County, Alabama against CSX, a corporation incorporated under the laws of Virginia with its principal place of business in Florida. In May 1995, CSX removed the case to the United States District Court for the Northern District of Alabama, asserting diversity of citizenship as the basis for federal jurisdiction. Several months later, Ingram moved to amend her complaint to add the City as an additional defendant. The district court granted her motion.

In October 1996, the City and CSX filed separate motions for summary judgment. The

district court granted these motions, holding that FRSA preempted Ingram's inadequate signalization claim because federal funds had "materially participated" in the installation of the warning devices at the McKinney crossing.

## II. ISSUES AND STANDARDS OF REVIEW

We address two issues in this appeal. The first is whether the addition of the City, a nondiverse defendant, destroyed federal subject matter jurisdiction and, if so, whether this court may dismiss the City in order to retroactively restore diversity of citizenship. We review subject matter jurisdictional issues *de novo. Broughton v. Florida Int'l Underwriters, Inc.,* 139 F.3d 861, 863 (11th Cir.1998).

After resolving the jurisdictional question, the second issue we consider is whether the district court erred in granting summary judgment in favor of the appellees on federal preemption grounds. This court reviews the district court's grant of summary judgment *de novo,* applying the same legal standard that the district court employed in the first instance. *Hairston v. Gainesville Sun Publishing Co.,* 9 F.3d 913, 918-19 (11th Cir.1993).

## III. DISCUSSION

A. Jurisdiction

Ingram first raised the issue of whether federal subject matter jurisdiction exists at oral argument. "Questions of subject matter jurisdiction may be raised ... at any time during the pendency of the proceedings." *United States v. Ayarza-Garcia,* 819 F.2d 1043, 1048 (11th Cir.), *cert. denied,* 484 U.S. 969, 108 S.Ct. 465, 98 L.Ed.2d 404 (1987). Indeed, we are "bound to ascertain whether we possess ... subject-matter jurisdiction whether it is challenged by the litigants or not[.]" *Escobedo v. Estelle,* 655 F.2d 613, 614 (5th Cir, Unit A.1981). Thus, although "we normally will not address issues raised for the first time at oral argument, "[a]ny time doubt arises

as to the existence of federal jurisdiction, we are obliged to address the issue before proceeding further.'" *Rice v. Ford Motor Co.,* 88 F.3d 914, 917 n. 5 (11th Cir.1996) (*quoting Atlanta Gas Light Co. v. Aetna Cas. and Sur. Co.,* 68 F.3d 409, 414 (11th Cir.1995)). After oral argument, the parties submitted supplemental briefs on the jurisdictional issue.

This case involves no federal question. Jurisdiction therefore depends upon diversity of citizenship. It is axiomatic that lack of complete diversity between the parties deprives federal courts of jurisdiction over a lawsuit. *Strawbridge v. Curtiss,* 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806). At the time CSX removed this case to federal district court, complete diversity existed-Ingram is an Alabama resident and CSX is incorporated in Virginia and maintains its principal place of business in Florida. After removal, however, Ingram moved to amend her complaint to add the City as an additional defendant. The district court granted the motion and entered an order stating that it had done so "with the EXPRESS UNDERSTANDING that the addition of a non-diverse defendant [would] not destroy [the] court's diversity jurisdiction which [had] already attached."

The appellees argue that the district court's diversity jurisdiction was determined at the time CSX filed its notice of removal. The appellees rely on the Supreme Court's decision in *Freeport-McMoRan, Inc. v. K N Energy, Inc.,* which held that "[d]iversity jurisdiction, once established, is not defeated by the addition of a nondiverse [dispensable] party to the action." 498 U.S. 426, 428, 111 S.Ct. 858, 112 L.Ed.2d 951 (1991).[2] In *Freeport,* a gas seller brought a breach of contract action against a buyer. The seller then assigned its interest in the contract and substituted the

---

[2]It is undisputed that, as an alleged joint tortfeasor, the City is a "dispensable" party. *See* Temple v. Synthes Corp., Ltd., 498 U.S. 5, 7, 111 S.Ct. 315, 112 L.Ed.2d 263 (1990) (citing Advisory Committee Notes to Fed.R.Civ.P. 19(a), which state that "a tortfeasor with the usual "joint-and-several' liability is merely a permissive party to an action against another with like liability").

nondiverse assignee as a plaintiff pursuant to Fed.R.Civ.P. 25(c). In a *per curiam* opinion, the Supreme Court held that "diversity of citizenship is assessed at the time the action is filed[,]" and that "if jurisdiction exists at [that] time ... such jurisdiction may not be divested by subsequent events." *Freeport-McMoRan,* 498 U.S. at 428, 111 S.Ct. 858. The court rejected the opposite rule, which it reasoned could "have the effect of deterring normal business transactions during the pendency of what might be lengthy litigation." 498 U.S. at 428, 111 S.Ct. 858. The appellees assert that, under *Freeport,* federal diversity jurisdiction attached at the time of removal and was not destroyed when the district court added the City as a defendant. We disagree.

CSX and the City construe *Freeport* 's holding too broadly. *Freeport* does not stand for the proposition that *all* additions of nondiverse parties are permissible as long as complete diversity existed at the time of commencement of the lawsuit. Instead, the holding in *Freeport* relies upon the assignee's having been substituted as a plaintiff under Fed.R.Civ.P. 25(c). In this case, the City's addition was unrelated to rule 25. As a result, we find *Freeport* to be inapplicable. When the district court granted Ingram's motion to add the City as a defendant, complete diversity no longer existed between the parties, thereby destroying subject matter jurisdiction.

Although Ingram styled her motion to add the City as a motion to amend her complaint pursuant to Fed.R.Civ.P. 15(a), this amendment amounted to a joinder, pursuant to Fed.R.Civ.P. 20. We presume that Ingram sought to add the City because her alleged right to relief against it arose out of the same transaction or occurrence as her alleged right to relief against CSX, and because questions of law or fact common to both defendants were likely to arise in the action. *See* Fed.R.Civ.P. 20(a).[3] Thus, in determining whether to grant Ingram's motion, the district court

---

[3]Ingram's supplemental brief assumes, and the appellees do not seem to contest, that the City's addition may be construed as a joinder.

should have considered 28 U.S.C.A. § 1447(e), which provides: "If after removal the plaintiff seeks to join additional defendants whose joinder would destroy subject matter jurisdiction, the court may deny joinder, or permit joinder and remand the action to the State court." 28 U.S.C.A. § 1447(e) (West 1994).

The district court had no discretion to add the City as a defendant, retain jurisdiction and decide the case on the merits. Indeed, section 1447(e)'s legislative history indicates that Congress rejected a proposal that would have allowed district courts to join certain nondiverse parties and still decide the merits of the dispute. H.R.Rep. No. 889, 100th Cong., 2nd Sess. 72-73 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5982, 6033-34 (indicating that the proposal was rejected because it "would [have] provide[d] a small enlargement of diversity jurisdiction"); *see also* David D. Siegel, *Commentary on 1988 Revision of Section 1447,* in 28 U.S.C.A. § 1447 (West 1994). Because section 1447(e) was applicable here, the district court was left with only two options: (1) deny joinder; or (2) permit joinder and remand Ingram's case to state court. The district court chose to permit the diversity-destroying joinder and, as a result, it should have remanded this action to Alabama circuit court.

Ingram urges this court to reverse the summary judgment ruling and remand to the district court with directions to remand this case to Alabama circuit court. We find this course of action unnecessary. In *Newman-Green, Inc. v. Alfonzo-Larrain,* 490 U.S. 826, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989), the Supreme Court held that federal courts of appeals have the authority-like that given to the district courts in Fed.R.Civ.P. 21-to dismiss dispensable, nondiverse parties to cure defects in diversity jurisdiction.[4] Ingram argues that dismissing the City in this case would be

---

[4]In relevant part, Fed.R.Civ.P. 21 provides as follows:

Misjoinder of parties is not ground for dismissal of an action. Parties may be

inappropriate for two reasons. First, Ingram asserts that this court is as limited in its options as the district court was once it permitted the City to be joined-the district court's only option under section 1447(e) was to remand the case to state court. Likewise, Ingram claims, section 1447(e) leaves this court with no alternative but to direct the district court to remand this case to state court. *Newman-Green* 's broad language, however, belies Ingram's contention that the district court's joinder ruling absolutely deprives this court of any discretion to retroactively restore subject matter jurisdiction. *See, e.g., Casas Office Machines, Inc. v. Mita Copystar America, Inc.,* 42 F.3d 668, 677-78 (1st Cir.1994) (citing *Newman-Green* and dismissing dispensable diversity-spoiling defendants who were added as parties to the lawsuit after the case was removed to district court).

Second, Ingram emphasizes the Supreme Court's qualifying language in *Newman-Green, i.e.,* that appellate courts' authority to dismiss dispensable nondiverse parties "should be exercised sparingly" and that the appellate court "should carefully consider whether the dismissal ... will prejudice any of the parties in the litigation." *Newman-Green,* 490 U.S. at 837-38, 109 S.Ct. 2218. Ingram claims that she will be prejudiced if we exercise our dismissal power here because the statute of limitations has expired on any claim she may have had against the City. This consideration might be persuasive where a litigant raises the jurisdictional issue at an earlier stage in the proceedings. Ingram, however, waited until her oral argument presentation on appeal-long after the district court's adverse ruling on the merits of her case. We decline to reward such delay. We therefore exercise our authority, pursuant to *Newman-Green,* to dismiss the City of Albertville, Alabama. Having retroactively restored complete diversity, we retain subject matter jurisdiction and reach the merits.

B. Preemption

---

dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just.

Congress enacted FRSA "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C.A. § 20101.  In furtherance of these goals, FRSA gives the Secretary of Transportation the power to "prescribe regulations and issue orders for every area of railroad safety."  49 U.S.C.A. § 20103(a).  FRSA contains an express preemption clause, which provides that the states may "adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement."  49 U.S.C.A. § 20106.[5]

Congress enacted the Highway Safety Act of 1973, 23 U.S.C.A. §§ 101 *et seq.* (West 1990 & Supp.1998), in response to the Secretary's reports on grade crossing safety problems.  This Act makes federal funds available to the states in order to improve grade crossings.  In return, the states must "conduct and systematically maintain a survey of all highways to identify those railroad crossings which may require separation, relocation, or protective devices, and establish and implement a schedule of projects for this purpose."  23 U.S.C.A. § 130(d).  The Secretary, through

---

[5]In its entirety, FRSA's preemption clause reads as follows:

> Laws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable.  A State may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement.  A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety when the law, regulation, or order—
>
> (1) is necessary to eliminate or reduce an essentially local safety hazard;
>
> (2) is not incompatible with a law, regulation, or order of the United States Government;  and
>
> (3) does not unreasonably burden interstate commerce.

49 U.S.C.A. § 20106.

the Federal Highway Administration (FHWA), promulgated additional regulations setting out further conditions on the states' use of federal aid to improve grade crossings. At issue in this case are 23 C.F.R. §§ 646.214(b)(3) and (4) (hereinafter "(b)(3)" or "(b)(4)").[6] These provisions require that a grade crossing improvement project either include an automatic gate or receive FHWA approval if

---

[6]In relevant part, 23 C.F.R. § 646.214(b) reads as follows:

(b) *Grade Crossing Improvements.* ...

(3)(i) *Adequate warning devices,* under § 646.214(b)(2) or on any project where Federal-aid funds participate in the installation of the devices are to include automatic gates with flashing light signals when one or more of the following conditions exist:

(A) Multiple main line railroad tracks.

(B) Multiple tracks at or in the vicinity of the crossing which may be occupied by a train or locomotive so as to obscure the movement of another train approaching the crossing.

(C) High Speed train operation combined with limited sight distance at either single or multiple track crossings.

(D) A combination of high speeds and moderately high volumes of highway and railroad traffic.

(E) Either a high volume of vehicular traffic, high number of train movements, substantial numbers of schoolbuses or trucks carrying hazardous materials, unusually restricted sight distance, continuing accident occurrences, or any combination of these conditions.

(F) A diagnostic team recommends them.

(ii) In individual cases where a diagnostic team justifies that gates are not appropriate, FHWA may find that the above requirements are not applicable.

(4) For crossings where the requirements of § 646.214(b)(3) are not applicable, the type of warning device to be installed, whether the determination is made by a State regulatory agency, State highway agency, and/or the railroad, is subject to the approval of FHWA.

23 C.F.R. §§ 646.214(b)(3) and (4).

federal funds "participate in the installation" of the warning devices. The issue presented here is whether these regulatory provisions preempt Ingram's state law negligence claim based on inadequate signalization at the McKinney crossing.

The Supreme Court specifically addressed the preemptive effect of sections (b)(3) and (b)(4) in *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). The Court concluded that these regulatory provisions "displace state and private decision-making authority by establishing a federal-law requirement that certain protective devices be installed or federal approval obtained." 507 U.S. at 670, 113 S.Ct. 1732. The Court therefore held that "when [these regulations] are applicable, state tort law is pre-empted." 507 U.S. at 670, 113 S.Ct. 1732. The Court in *Easterwood* found, however, that the petitioner's state law claims were not preempted because "the preconditions for the application of either regulation [had not] been met." 507 U.S. at 671, 113 S.Ct. 1732. Namely, the record in *Easterwood* did "not establish that federal funds "participate[d] in the installation of the [warning] devices' " at the subject grade crossing. 507 U.S. at 672, 113 S.Ct. 1732.

In this case, it is undisputed that federal funds participated in the installation of the passive warning devices at the McKinney crossing. Three other circuit courts have held that such funding equates to federal approval of the warning devices installed, thereby triggering federal preemption of a plaintiff's state law negligence claim based upon inadequate signalization. *See Armijo v. Atchison, Topeka and Santa Fe Ry. Co.,* 87 F.3d 1188 (10th Cir.1996); *Elrod v. Burlington Northern R. Co.,* 68 F.3d 241 (8th Cir.1995); *Hester v. CSX Transp., Inc.,* 61 F.3d 382 (5th Cir.1995), *cert. denied,* 516 U.S. 1093, 116 S.Ct. 815, 133 L.Ed.2d 760 (1996). The Eighth Circuit explained that "[f]ederal funding is the touchstone of [FRSA] preemption ... because it indicates that the warning devices have been deemed adequate by federal regulators." *Elrod,* 68 F.3d at 244.

Similarly, the Tenth Circuit reasoned that "[t]he Secretary of Transportation's authorization of passive warning devices [is] tantamount to a determination, pursuant to [section (b)(4) ], that only passive, rather than active, warning devices [are] sufficient[.]" *Armijo,* 87 F.3d at 1190. Likewise, the Fifth Circuit held that "[t]he fact that federal funds participated in the installation of the warning devices legally presupposes that the Secretary approved and authorized that expenditure, which in turn legally presupposes that the Secretary determined that the safety devices installed were adequate to their task." *Hester,* 61 F.3d at 387.

Ingram argues, however, that the expenditure of federal funds should not, in and of itself, trigger federal preemption in this case. She contends that section (b)(3) was not complied with and, therefore, the railroad should not be permitted to use section (b)(4) to shield it from liability via the defense of FRSA preemption. Specifically, Ingram asserts that she presented evidence tending to indicate that the sight distance at the McKinney crossing was "unusually restricted," and that unsafe conditions at the McKinney crossing gave rise to "continuing accident occurrences." Ingram argues that, given these circumstances, active warning devices should have been installed pursuant to section 646.214(b)(3)(i)(E), *unless* a diagnostic team "justifie[d] that [active warning devices were] not appropriate," pursuant to section 646.214(b)(3)(ii). Ingram emphasizes that CSX failed to present any evidence that a diagnostic team ever evaluated the McKinney crossing to make such a determination regarding the appropriateness of passive warning devices. Thus, under Ingram's theory, we have no occasion to consider section (b)(4)'s method for obtaining federal approval, because section (b)(4) only enters into the analysis "[f]or crossings where the requirements of § 646.214(b)(3) are *not* applicable." 23 C.F.R. § 646.214(b)(4) (emphasis added).

Ingram's position is not without support. The Seventh Circuit in *Shots v. CSX Transp., Inc.,* 38 F.3d 304 (7th Cir.1994), held that mere federal financial participation in a grade crossing upgrade

project was insufficient to trigger FRSA preemption unless some evidence existed that the Secretary of Transportation *actually* approved of the specific warning devices installed. The Seventh Circuit declined to presume such approval from the expenditure of federal funds. At the time of the accident giving rise to the claim in *Shots,* the grade crossing was equipped only with reflectorized crossbucks, which had been installed pursuant to an agreement between the state of Indiana and the railroad to "upgrade" thousands of the railroad's crossings to "minimum standards, as established by the State[.]" 38 F.3d at 306. The Secretary of Transportation approved the project and provided federal funding without receiving a report from a diagnostic team regarding the type of warning systems required at each individual crossing. In concluding that the plaintiff's claims were not preempted, the Seventh Circuit explained:

> The agreement [between the state and the railroad] does not state or imply that the thousands of crossings covered by it would be adequately safe if equipped with reflectorized cross-bucks.... [T]he agreement is explicitly limited to providing the "minimum" in passive protections.... Minimum is not a synonym for optimum, or even adequate.... So far as can be gathered from the record compiled in the district court, the agreement was a step on the road to adequate safety rather than a determination by the State of Indiana or the federal Secretary of Transportation as to what safety devices would be adequate at each of the thousands of crossings covered by it.

> Thus we do not think it can be realistically said, to use the formulation in *Easterwood,* that "the Secretary has determined the devices to be installed" at these crossing merely because he authorized federal funds to bring them up to minimum standards, utilizing passive warning devices solely. Indeed, it would have been an extraordinary act of irresponsibility for the Secretary of Transportation, by approving the agreement, to preclude tort liability for the railroad's failing to have active warning devices at any of the thousands of crossings covered by the agreement, or otherwise to prevent the state from requiring adequate safety devices at the busiest or most dangerous of these crossings, when no one in the federal government had made a determination that the improvements to be made would bring all the crossings up to a level of safety adequate to satisfy federal standards.

*Shots,* 38 F.3d at 308-09.

We decline to adopt the Seventh Circuit's approach. Instead, we join the Fifth, Eighth and Tenth Circuits in holding that the participation of federal funds in a grade crossing improvement

project triggers FRSA preemption of a plaintiff's inadequate signalization claim. We recognize that the Secretary of Transportation's approval of funds to improve the McKinney crossing was only a portion of a larger project to improve numerous grade crossings in Alabama. We do not think, however, that this undermines our conclusion. It is true that the Secretary made no specific administrative finding, pursuant to section (b)(4), that passive warning devices were sufficient to address whatever safety hazards may have existed at the McKinney crossing. Such an express finding, however, is not the *only* way for the Secretary to have "approved" of the safety devices that were installed. The Secretary's approval may also be inferred. Thus, in authorizing the expenditure of federal funds to install the passive devices at the McKinney crossing, we presume that the Secretary approved of those devices. We think that this approval eliminates the need to consider whether section (b)(3) conditions existed. As the Fifth Circuit explained in *Hester,*

> The regulations direct the Secretary to authorize the expenditure of federal funds only on projects that satisfy, *inter alia,* the requirements of federal law, specifically 23 U.S.C. § 109.... Under that section, "[n]o funds shall be approved for expenditure ... unless proper safety protective devices complying with safety standards *determined by the Secretary at that time as being adequate* shall be installed or be in operation at any highway and railroad grade crossing...." 23 U.S.C. § 109(e)(emphasis added).

61 F.3d at 387 (footnote omitted).

Contrary to Ingram's assertion, this court's decision in *Michael v. Norfolk Southern Ry. Co.,* 74 F.3d 271 (11th Cir.1996), is inapposite. In *Michael,* the plaintiff alleged that the active warning device at the subject crossing, an automatic gate, had been negligently installed because the gate arm was too short. The *Michael* court labeled this type of claim a "negligent design or construction" claim. 74 F.3d at 273. Ingram, however, does not allege that the actual passive warning devices at the McKinney crossing were negligently installed or otherwise failed to comply with federal design specifications. Rather, she contends that the entire passive warning design itself is "defective" because active warning devices should have been installed. The court in *Michael* seems to allude

to this type of claim and labels it one for "defective design." 74 F.3d at 273. Citing *Easterwood,* the court in *Michael* observed that "there can be no state law claim against the railroad for defective design" because "[t]he crossing devices at issue ... were federally funded[.]" 74 F.3d at 273. Thus, *Michael* supports our conclusion that Ingram's claim is preempted.

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED.