BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY, Soo Line Railroad Company, Union Pacific Railroad Company, and Wisconsin Central Ltd., Plaintiffs–Appellants, Cross–Appellees,

v.

James E. DOYLE, Attorney General of Wisconsin, E. Michael McCann, District Attorney of Milwaukee County, Thomas L. Storm, District Attorney of Fond du Lac County, et al., Defendants–Appellees, Cross–Appellants,

and

United Transportation Union, Intervening Defendant–Appellee, Cross–Appellant.

Nos. 98–4057, 98–4149 and 98–4166.

United States Court of Appeals, Seventh Circuit.

Argued May 19, 1999.

Decided July 23, 1999.

Jon P. Axelrod, Dewitt, Ross & Stevens, Madison, WI, Ronald M. Johnson (argued), Akin, Gump, Strauss, Hauer & Feld, Washington, DC, for Plaintiffs–Appellants, Cross–Appellees.

James E. Doyle, pro se, Office of Attorney General, Wisconsin Department of Justice, Madison, WI, for Defendants–Appellees and Defendants.

Thomas C. Bellavia (argued), Office of Attorney General, Wisconsin Department of Justice, Madison, WI, for Defendants–Appellees and Defendants–Appellants.

Marilyn Townsend, Madison, WI, Lawrence M. Mann (argued), Alper, Mann & Weisbaum, Washington, DC, for United Transportation Union.

Thomas L. Smallwood, Borgelt, Powell, Peterson & Frauen, Milwaukee, WI, for Association of American Railroads, Amicus Curiae, American Short Line and Regional Railroad Association, Amicus Curiae and American Short Line Railroad Association, Amicus Curiae.

Susan K. Ullman, Office of Attorney General, Wisconsin Department of Justice, Madison, WI, for Defendants–Appellants.

Before WOOD, JR., FLAUM, and MANION, Circuit Judges.

MANION, Circuit Judge.

The plaintiffs, four railroads that operate in Wisconsin, sued the Wisconsin attorney general and three county district attorneys seeking a declaration that a Wisconsin law requiring train crews to consist of at least two persons and also requiring crew members to have certain qualifications is preempted by federal regulations promulgated under the Federal Rail Safety Act, 49 U.S.C. § 20101 *et seq.* The United Transportation Union, which represents nearly all unionized trainmen in the United States, intervened as a defendant. The district court decided the case on cross motions for summary judgment. It held that the parts of the statute requiring certain qualifications for engineers and train crew members were preempted, but held that the part requiring two-person crews was not. The railroads appeal from the ruling regarding the two-person crew requirement. We disagree with the district court's conclusion that the two-person crew requirement is preempted in no circumstances. We hold that federal regulations have approved the

use of one-person crews in two types of operations but not in a third. Thus, Wisconsin's two-person crew requirement is preempted in part. The defendants cross-appeal from the finding that the statute's crew qualification provisions are preempted. We agree with the district court. We also hold that the state law is severable, so that the part that is not preempted can survive on its own. We therefore affirm the judgment of the district court in part and reverse in part.

## I.

### A. Wisconsin's Two–Person Crew Law and This Suit

On December 15, 1997, Wisconsin enacted Wis. Stat. § 192.25 to regulate the qualifications of train crew members and to require at least two persons in all train crews. In its entirety, the statute provides:

(1) In this section:

(a) "Certified railroad locomotive engineer" means a person certified under 49 CFR 240 as a train service engineer, locomotive servicing engineer or student engineer.

(b) "Qualified railroad trainman" means a person who has successfully completed a railroad carrier's training program and passed an examination on railroad operation rules.

(2) No person operating or controlling any railroad, as defined in s. 85.01(5), may allow the operation of any railroad train or locomotive in this State unless the railroad train or locomotive has a crew of at least 2 individuals. One of the individuals shall be a certified railroad locomotive engineer. The other indi-

vidual shall be either a certified railroad locomotive engineer or a qualified railroad trainman. A certified railroad locomotive engineer shall operate the control locomotive at all times that the railroad train or locomotive is in motion. The other crew member may dismount the railroad train or locomotive when necessary to perform switching activities and other duties in the course of his or her job.

(3)(a) The office, by rule, may grant an exception to sub. (2) if the office determines that the exception will not endanger the life or property of any person.

(b) Subsection (2) does not apply to the extent it is contrary to or inconsistent with a regulation or order of the federal railroad administration.

(4) Any person who violates sub. (2) may be required to forfeit not less than $25 nor more than $100 for a first offense, not less than $100 nor more than $500 for a 2nd offense committed within 3 years, and not less than $500 nor more than $1,000 for a 3rd offense committed within 3 years.

Section 192.25 was to become effective January 1, 1998. On December 31, 1997, the plaintiffs filed this suit, naming the Wisconsin Attorney General and three county district attorneys as defendants.[1] (For convenience, we will refer to these defendants as "Wisconsin.") Three of the plaintiffs are large, national railroads: Burlington Northern & Santa Fe Railway Company, Soo Line Railroad Company, and Union Pacific Railroad Company. The fourth plaintiff is a smaller, regional railroad: Wisconsin Central Limited.[2]

---

1. The defendants are James E. Doyle, Wisconsin Attorney General, E. Michael McCann, District Attorney of Milwaukee County, Thomas L. Storm, District Attorney of Fond du Lac County, and David Blank, District Attorney of Douglas County. Each defendant was sued in his individual and official capacities.

2. Two associations to which the plaintiffs belong filed an *amicus curiae* brief in this court and the district court. The Association of American Railroads (AAR) is a trade association whose members are large freight railroads and the National Railroad Passenger Corporation (Amtrak). Its members include

Each plaintiff operates in Wisconsin. The complaint alleged that regulations promulgated under the Federal Rail Safety Act preempted § 192.25, and that the statute violated the federal and Wisconsin constitutions. The plaintiffs sought declaratory and injunctive relief. The parties agreed that Wisconsin would not enforce the statute in part pending the outcome of this litigation, or until December 31, 1998. (The parties have not informed us whether they have agreed to continue the stay.) The United Transportation Union (UTU) later intervened as a defendant. The parties filed cross motions for summary judgment, and subsequently stipulated that the plaintiffs would dismiss without prejudice the counts raising constitutional issues. The district court granted each side summary judgment in part. The court held that § 192.25's crew qualification requirements were preempted by federal law but held that its requirement for two-person crews was not. The parties have each appealed parts of the district court's decision.

## B. FRSA Preemption

■ "[T]he Laws of the United States ... shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., Art. VI, cl. 2. Federal law, therefore, preempts state law. The Supreme Court summarized how the courts are to analyze preemption issues:

> In the interest of avoiding unintended encroachment on the authority of states, however, a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluc-

tant to find preemption. Thus, preemption will not lie unless it is the clear and manifest purpose of Congress. Evidence of preemptive purpose is sought in the text and structure of the statute at issue. If the statute contains an express preemption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent.

*CSX Transportation, Inc. v. Easterwood,* 507 U.S. 658, 663–64, 113 S.Ct. 1732, 123 L.Ed.2d 387, (1993) (citations and internal quotations omitted). Because federal preemption is a question of statutory interpretation, we review this issue *de novo*.

In response to a perceived need for comprehensive rail safety regulation, Congress passed the Federal Rail Safety Act of 1970 (FRSA), as amended 49 U.S.C. § 20101 *et seq.*[3] The purpose of the FRSA was to "promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. Thus, the Secretary of Transportation was given broad power to regulate and a mandate to use that power: "The Secretary of Transportation, as necessary, shall prescribe regulations and issue orders for every area of railroad safety." 49 U.S.C. § 20103. The Secretary regulates rail safety through the Federal Railroad Administration (FRA). The FRSA also advanced the goal of national uniformity of regulation because one of its provisions expressly preempts state laws regulating rail safety. 49 U.S.C. § 20106. Because the FRSA contains an express preemption provision, our task principally is to apply

plaintiffs Burlington Northern, Soo Line, and Union Pacific. AAR's members represent the substantial majority of all rail freight in the United States. The second *amicus*, the American Short Line and Regional Railroad Association (ASLRRA), is a trade association whose members are small and medium sized regional freight railroads. ASLRRA's members include plaintiff Wisconsin Central and two other regional railroads that operate in Wisconsin.

3. FRSA was formerly codified at 45 U.S.C. § 421 *et seq.* but was recodified without substantive change in Title 49 as part of a recodification of rail safety laws in 1994. *See* Pub. L. No. 103–272. Many prior court decisions interpreting FRSA refer to the prior U.S. Code sections. FRSA's preemption provision, 49 U.S.C. § 20106, was codified at 45 U.S.C. § 434.

the provision according to its terms. Section 20106 provides:

> Laws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable. A state may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the state requirement. A state may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety when the law, regulation or order—
>
>> (1) is necessary to eliminate or reduce an essentially local safety hazard;
>>
>> (2) is not incompatible with a law, regulation, or order of the United States Government; and
>>
>> (3) does not unreasonably burden interstate commerce.

Under this scheme, then, state regulations can fill gaps where the Secretary has not yet regulated, and it can respond to safety concerns of a local rather than national character. Wisconsin does not justify § 192.25 as a response to a local safety hazard, so the precise issue before us is whether the Secretary "prescribe[d] a regulation or issue[d] an order covering the subject matter" of § 192.25. This issue requires us to answer three sub-issues: What is the "subject matter" of the state requirement? What action by the Secretary amounts to issuing an "order"? ("Prescrib[ing] a regulation" is a clear enough term.) When does such an order or regulation "cover" the subject matter of a state requirement?

■ The third question is the most easily answered because in *Easterwood* the Supreme Court thoroughly analyzed when FRA regulations "cover" the subject matter of a state requirement. Noting that "cover" was a somewhat restrictive term, the Court held that "[the party asserting preemption] must establish more than that [the regulations] 'touch upon' or 'relate to'

the subject matter... pre-emption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law." 507 U.S. at 664–65, 113 S.Ct. 1732 (citations omitted). Importantly, preemption does not depend on a single federal regulation itself covering the subject matter of the state law. In *Easterwood* the Court found preemption by examining "related safety regulations" and "the context of the overall structure of the regulations." *Id.* at 674, 113 S.Ct. 1732.

What constitutes an "order" for FRSA preemption is less clear. This term is not defined in the FRSA, and the Supreme Court has not had occasion to define it. The district court relied upon the definition of "order" in the Administrative Procedures Act, 5 U.S.C. § 551(6), which defines an order to include "a final disposition, whether affirmative, negative, injunctive, or declaratory in form[,] ... other than rulemaking." Certainly if an agency action constitutes an "order" under the APA definition, it would be an order for FRSA preemption. Because the actions in this case fit the APA definition, we need not decide whether an action that does not fit that definition could nonetheless be an order under § 20106. But we also note that "final disposition" includes informal decisions. *See Atchison, Topeka & S. F. R.R. v. Pena*, 44 F.3d 437, 441 (7th Cir. 1994) (*en banc*) (letter from the FRA's Chief Counsel announcing change in the FRA's interpretation of law was "final agency action" because letter made the FRA's position "absolutely clear"), *aff'd. sub nom. Brotherhood of Locomotive Engineers v. Atchison, T. & S. F.R.R.*, 516 U.S. 152, 116 S.Ct. 595, 133 L.Ed.2d 535 (1996) (not addressing issue of "final agency action"); *see also United Transp. Union v. Lewis*, 711 F.2d 233, 240 (D.C. Cir.1983) (court reviewed agency's interpretation of law expressed in letter). For preemption, the important thing is that the FRA considered a subject matter and made a decision regarding it.

The particular form of the decision is not dispositive.

"The subject matter of the state requirement" is the safety concerns that the state law addresses. *See Burlington Northern R.R. v. Montana,* 880 F.2d 1104, 1106 (9th Cir.1989) ("[The FRSA] preempts all state regulations aimed at the same safety concerns addressed by FRA regulations."). Generally, determining the safety concerns that a state or federal requirement is aimed at will necessarily involve some level of generalization that requires backing away somewhat from the specific provisions at issue. *See Shots v. CSX Transp., Inc.,* 38 F.3d 304, 307 (7th Cir.1994) (in analyzing preemption of state negligence claim for inadequate warning device at rail crossing, court referred to "subject matter of highway safety at that crossing"). Otherwise a state law could be preempted only if there were an identical federal regulation, and, as we noted, *Easterwood* teaches that this is not so. *See* 507 U.S. at 674, 113 S.Ct. 1732 (preemption found through series of related regulations and overall structure of the regulations, although no regulation directly addressed the state requirement); *see also Burlington Northern R.R.,* 880 F.2d at 1106 (FRA regulation permitting telemetry device rather than visual inspection preempted state law requiring trains to have a caboose because both were aimed at the safety concern of monitoring brakes and signals at the rear of the train). But with too much generalizing—"public safety" or "rail safety"—our analysis would be meaningless because all FRA regulations cover those concerns.

## II.

### A. Whether Section 192.25's Crew Qualification Requirements Are Preempted

The broad safety concern that § 192.25 is aimed at is ensuring that a train or locomotive crew can operate safely. The statute addresses this broad concern by addressing two related concerns: (1) who is qualified to operate a train or locomotive safely, and (2) what is the minimum number of crew persons needed to operate a train or locomotive safely. This section of our opinion addresses the statute's provisions regarding the first concern, and the next section addresses the statute's provisions regarding the second concern.

■ The statute addresses who is qualified to operate a train in three ways: § 192.25(1)(a) requires certain qualifications for a "Certified railroad locomotive engineer"; § 192.25(1)(b) requires certain qualifications for a "Qualified railroad trainman"; and § 192.25(2) requires that a certified railroad locomotive engineer operate the controls of the locomotive any time the train or locomotive is moving. Federal regulations clearly cover the subject matter of these requirements. Section 192.25(1)(a) itself expressly incorporates the numerous federal regulations in 49 C.F.R. part 240 that set the qualifications of an engineer. Section 192.25(1)(b) requires that a trainman be instructed and tested in the railroad's operating procedures, and the training of railroad employees is covered by federal regulations. *See, e.g.,* 49 C.F.R. § 217.11(c) (requires tests of employees). In the face of the federal regulations, Wisconsin argues that these provisions are not preempted not because the federal regulations do not cover the subject matter of the state requirements, but because the state statute does not impose contradictory requirements. The short answer to this argument is that the text of § 20106 provides that a state may enforce a law "related to railroad safety *until* the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the state requirement." (Emphasis supplied.) This language does not distinguish between contradictory state requirements and merely duplicative state requirements. We previously stated:

> If the Secretary promulgates a regulation that covers the subject matter of some state safety requirement, the state

requirement must give way (with an inapplicable exception) even if there is no direct conflict, that is, even if the federal and state requirements would not place the railroad under conflicting duties. *Shots*, 38 F.3d at 307. Moreover, Wisconsin's requirement that an engineer be at the controls of the locomotive any time it moves does directly conflict with a federal regulation: 49 C.F.R. § 240.7, which excludes from the definition of locomotive engineers—and thus the requirement to satisfy all qualifications—persons who move the locomotive up to 100 feet in a repair or servicing area to inspect and maintain it. These three provisions of § 192.25 are therefore preempted by the federal regulations.

## B. Whether § 192.25's Two–Person Crew Requirement Is Preempted

### 1. General Background

Section 192.25(2) also requires that at least two crew members be on the train or locomotive whenever it is moving, although it permits the second crew member to dismount the train to perform tasks such as switching and coupling or uncoupling. This provision expresses Wisconsin's conclusion that lone engineer and remote control operations are always unsafe. There is no federal regulation directly addressing when lone engineer or remote control operations are safe; if there were, this would be an easier case. So, as *Easterwood* teaches, we have to examine all related regulations and orders to see if the FRA has determined when these operations may be done. The parties make all-or-nothing arguments regarding the two-person crew requirement. That is, they argue either that the FRA has approved all one-person crew operations, or that it has approved none. We think a more flexible analysis is required because one-person crews are used in various types of operations that differ from each other considerably.

The number of crew persons on a train is determined by the operating conditions and, sometimes, by the terms of the railroad's collective bargaining agreements. Generally trains operate with two or three crew members: an engineer and a conductor and (possibly) a brakeman. (The crew members are sometimes called "trainmen.") Prior to the demise of the steam locomotive, at least two crew members were needed in the locomotive itself: the engineer and the fireman. But with the advent of diesel locomotives, the engineer can operate the locomotive by himself, and in some operations, a conductor or brakeman is not essential. Thus, some railroads operate trains with only one crew member in three different situations that are relevant to this case: "hostling" movements, "helper" movements, and "over-the-road" movements. "Hostling" movements involve short distances at a train yard. After the train has arrived at the yard and its cars are uncoupled, an employee, called a "hostler," will often move the locomotive to another area. Locomotive movements without any attached cars are called "light" movements. "Helper" movements are another type of light movement. Sometimes a train will have to ascend or descend a restrictive grade that requires more locomotive power than it has. To assist it over the grade, a "helper" locomotive is sent from the yard and connects to the front or back of the train, which then is able to make the ascent or descent. Afterwards, the helper locomotive is uncoupled and returns to the yard. Finally, "over-the-road" movements involve hauling train cars between terminals. Presently it appears that none of the plaintiffs uses one-person crews for over-the-road movements in Wisconsin. Under their current collective bargaining agreements, Burlington Northern, Soo Line, and Union Pacific cannot use one-person crews for any over-the-road movements. They state that they would consider doing so when and if they are able to negotiate a change to their bargaining agreements. Wisconsin Central previously used one-person crews for over-the-road movements in Wisconsin,

but its use of them has been dictated by the terms of safety agreements with the FRA.

The FRA has had several occasions in the 1990's to review the safety of some aspects of one-person crews. To decide the extent to which § 192.25's two-person crew requirement has been preempted, we must examine the FRA's various orders and regulations and determine whether they have "covered" the subject matter of safety for one-person crews in any of these different types of operations.

### 2. Federal Regulations and Orders Regarding Train Crew Size

#### a. The Blue Signal Regulations

In 1993, the FRA promulgated a new rule regarding "utility employees" temporarily assigned to work with train or yard crews. Some background is necessary to understand the FRA's rule-making. Since 1970, the FRA's regulations had distinguished "train and yard crews" from "workers."[4] The former were the engineers, conductors, and brakemen who were assigned to a particular train—"rolling equipment." "Workmen" were employees who were not a part of a particular crew but whose job required them to work on, under, or between rolling equipment doing such things as inspecting or repairing locomotives and cars. When a worker was working on, under, or between rolling equipment, he was required to comply with certain "blue signal" rules found in 29 C.F.R. part 218. Essentially, the worker posted a blue flag or sign on or near the train. No one could then move the train until he had found the worker who posted the blue signal and verified that the worker was not in danger when the train moved. Train and yard crew members were generally excluded from the blue signal requirement. The logic of the rule is simply that one of the greatest dangers to an employee working around rolling equipment is that the equipment might move

unexpectedly because of a lack of communication between the crew and a worker. Because train and yard crews work together as a team and keep in constant communication, there is much less danger of the engineer unexpectedly moving the train while another crewman is, for example, uncoupling a car.

In 1993, however, the FRA modified its regulations to account for substantial changes in the typical size of train crews, and the development of a new type of employee: the "utility employee." In announcing the new regulation, the FRA stated:

> Since promulgation of the regulation [in 1970], the size of train and yard crews has been significantly reduced through the collective bargaining process and increased operating efficiencies. Implementation of the recommendations of Presidential Emergency Board No. 219 ("PEB 219") (see Pub. L. No. 102–29, 1991) is greatly accelerating this process. Through this and prior processes, crews that once consisted of a locomotive engineer, fireman, conductor, and two trainmen, have in many cases been reduced to a locomotive engineer and conductor only.

58 Fed.Reg. 43288. As the crew sizes decreased, many railroads began using "utility employees" who were attached temporarily to train and yard crews. Under the prior regulations, there was confusion and disagreement about whether these utility employees were train and yard crew members, thus excluded from the blue signal requirement, or were workers who were not. After studying the situation, in 1993 the FRA changed the regulations to expressly account for the changes in the industry. The new regulations defined train and yard crews, utility employees, and workers, and set out when each was subject to the blue signal requirement. In so doing, the FRA recog-

---

4. Actually the regulations first called these employees "workmen," but that term was changed to "worker" in 1993. We use the current term for convenience.

nized that sometimes train or yard crews had only one person, and it adopted a different standard for such crews.

The regulations provided that a utility employee could be part of train and yard crews, and so excluded from the blue signal requirement, only when an engineer was at the controls of the locomotive, or at least in the cab. 29 C.F.R. § 218.22(c) & (e). The FRA explained that "[t]he presence and vigilance of the engineer at the controls (or, at the very least, in the cab) of the controlling locomotive is essential." 58 Fed.Reg. 43291. The FRA permitted, however, another member of the train or yard crew to go into the cab if the engineer had to perform some function outside. *Id.* The notice also explained:

> A single locomotive engineer in helper service, or a single hostler may not take advantage of the exclusion from blue signal protection unless joined by a utility employee. Absent a crew member to monitor the locomotive, blue signal protection is required.

*Id.* The exclusion of single-person train and yard crews from the blue signal protection was noted only in the preamble to the new rule, not in the text itself. The FRA later explained why it had done so:

> FRA's notice of proposed rule making requested comment on the protection needed for a single locomotive engineer performing helper or hostler service.... Protecting one-member crews was therefore within the scope of the notice. FRA chose not to address the subject in rule text because no comments were received. In the preamble to the final rule, however, FRA expressed discomfort with one-member crews. It was stated that a lone engineer could not take advantage of the exclusion from blue signal protection unless joined by a utility employee to ensure that the locomotive cab was always occupied.

60 Fed.Reg. 11047.

In response to the preamble's making one-person train and yard crews subject to the blue signal requirement, the AAR peti-tioned the FRA for reconsideration. On March 1, 1995, the FRA announced an amendment to the rule. 60 Fed.Reg. 11047. The FRA summary stated "[t]he amendment will permit single-person crews to work within the protections provided for train and yard crews." *Id.* The FRA expressed its continued concern "with the unique risk faced by lone engineers despite the current lack of evidence of a substantial injury record for one-member crews. An engineer assigned to helper or hostler service must frequently perform work, such as placing rear end markers or making connections between locomotives, that puts that employee in danger, particularly when this work is performed in congested terminals and rail yards." 60 Fed.Reg. 11047, 11048. So the FRA issued a new regulation, 49 C.F.R. § 218.24, which permitted a lone engineer to work on, under, or between rolling stock without blue signal protection only if certain specified conditions were met. The regulation also covered how a single engineer in helper service would communicate with the crew he was assisting and how the two crews would go about moving their respective trains. In response to this new rule for one-person crews, the FRA received numerous comments and petitions. After reviewing them, the FRA suspended the regulation as of its effective date, May 15, 1995. 60 Fed. Reg. 30469. The FRA also reopened the comment period on the amendment "regarding only the issue of one-person crews" and the comment period is apparently still open.

**b. The Wheeling & Lake Erie Remote Control Test Program**

By 1993 some railroads had begun using remote control devices with their one-person crews. These devices permitted a lone engineer working outside the cab to move the locomotive. Thus, a lone engineer would be able to perform a task that previously would have required the engineer to be in the cab moving the locomotive and communicating by radio with another crew

member working on the ground. The use of these devices raised some significant regulatory compliance issues. In January 1993, the Wheeling & Lake Erie Railway Company petitioned the FRA for waivers from certain regulatory requirements so that it could use remote control devices with lone engineers. The FRA invited comment, conducted a public hearing, and then on November 18, 1994, issued a notice that it would conduct a two-year test program for remote control devices involving Wheeling & Lake Erie, although it encouraged other railroads to join the test program. 59 Fed. Reg. 59826. The FRA allowed the continued use of remote control devices by other railroads only if they participated in the two-year test program. 59 Fed. Reg. 59827. The UTU petitioned the FRA to prohibit any use of remote control devices, but the FRA denied that petition. See 61 Fed. Reg. 58737.

### c. Wisconsin Central's Use of One–Person Crews for Over–the–Road Movements, Use of Remote Controls, and the FRA's Review

In 1996, Wisconsin Central proposed expanding its use of one-person crews for some over-the-road movements on four new routes. (At the time Wisconsin Central used one-person crews on four other routes.) On April 25, 1996, the UTU petitioned the FRA for an emergency order banning Wisconsin Central from using one-person crews for any over-the-road movements. (The FRA has not yet ruled on this petition.) The FRA then began reviewing Wisconsin Central's use of one-person crews and asked it not to expand its use of one-person crews for over-the-road movement during the review period. Wisconsin Central agreed.

In a May 8, 1996, letter to Wisconsin Central, the FRA stated:

We are aware that other railroads, as well as your own, currently operate one-person trains. For the most part, these operations are short, slow trains. You intend, however, to move mixed freight over long distances in these four routes. As you no doubt realize, your proposed operations are novel, and pose many complex problems.

Although there are no available data proving one-person crews are unsafe, there are also no data showing operations of the type you propose to be safe. . . .

The FRA listed a number of safety concerns and directed Wisconsin Central to submit an action plan detailing its operating standards for one-person crews and addressing these issues. The FRA approved Wisconsin Central's continued use of one-person crews on the four existing routes while the FRA studied the matter.

In September 1996, Wisconsin Central notified the FRA that it wanted to begin using remote control devices to move locomotives at two of its rail yards in Wisconsin. On September 17, 1996, the UTU petitioned the FRA for an emergency order banning the use of remote control devices not only by Wisconsin Central but by all railroads. (The FRA has not yet ruled on this petition either.) On November 18, 1996, the FRA announced that it would conduct public hearings in Wisconsin on the issue of Wisconsin Central's use of one-person crews and the use of remote control devices in general. The hearings were held on December 4 and 5, 1996, in Appleton, Wisconsin. Numerous persons testified regarding the safety of one-person crews and remote control devices, including then-Wisconsin State Representative John Dobyns. Dobyns admitted he was no expert on railroads, but opined that one-person crews and remote control devices were not safe. Shortly after testifying at the FRA hearings, Dobyns introduced the bill that eventually became § 192.25.

On January 10, 1997, the FRA wrote a letter to Wisconsin Central in which it indicated that it was reviewing the issues raised at the December hearings. The FRA permitted Wisconsin Central to continue with its then-current use of one-

person crews, but told it to wait until a final FRA decision before expanding its use of one-person crews. The FRA did bar Wisconsin Central from implementing remote controlled operations, however. Due to a high accident rate, the FRA began conducting a broad study of all of Wisconsin Central's operations. On February 8, 1997, Wisconsin Central and the FRA entered into a Safety Compliance Agreement. The agreement permitted Wisconsin Central to continue using one-person crews for light movements, that is,locomotive only, but not for over-the-road movements, and it prohibited Wisconsin Central from using remote control devices. Those restrictions did not apply to Wisconsin Central's Port Inland, Michigan, terminal. This agreement ended after 12 months and was replaced with a new Safety Compliance Agreement. The new agreement praised Wisconsin Central for its compliance with the prior agreement and as a result expanded slightly the types of one-person crew movements that Wisconsin Central could conduct. The second agreement also had a 12–month term, which has now expired. The record is silent as to whether Wisconsin Central has entered into another agreement.

### 3. The Preemptive Effect of The Federal Orders and Regulations

■ As we noted above, the record shows that there are three different kinds of one-person crew operations: hostling movements, helper movements, and over-the-road movements. As we discuss in detail below, on this record, we conclude that the FRA has issued final dispositions—"regulations" and "orders" under § 20106—permitting one-person crews to perform hostling and helper movements, but has not done so for one-person over-the-road operations. Thus, § 192.25(2)'s two-person crew requirement is preempted insofar as it bans one-person hostling and helper movements.

■ As we discussed above, between 1993 and 1995, the FRA considered and promulgated regulations governing when blue signal protection had to be used when a lone engineer performed hostling or helper service. In response to a petition for reconsideration, it suspended the regulation placing additional requirements on one-person crews (49 C.F.R. § 218.24). As our description of the rule-making process shows, the FRA considered the issue of safety for one-person crews conducting these two types of operations and whether additional precautions were needed. It ultimately decided not to impose any. When the FRA examines a safety concern regarding an activity and affirmatively decides that no regulation is needed, this has the effect of being an order that the activity is permitted. *See Norfolk & Western Ry. v. Public Util. Comm'n,* 926 F.2d 567, 570 (6th Cir.1991) (FRA decision not to impose requirement of walkways on railroad bridges preempted state requirement of such walkways); *Burlington Northern R.R.,* 880 F.2d at 1106–07 (FRA's considering adopting rule requiring caboose but declining to do so reinforced conclusion that telemetry regulation preempted state requirement for caboose); *Missouri & Pacific R.R. v. Texas R.R. Comm'n,* 850 F.2d 264, 267–68 (5th Cir.1988) (same). The district court was therefore incorrect to conclude that because 49 C.F.R. § 218.24 was suspended it is irrelevant to the issue of preemption. The decision to impose the added safety requirements for certain one-person operations and the decision to suspend it were final dispositions of the FRA's position on the matter, and were thus "orders" under § 20106.

Wisconsin argues that the subject matter of the FRA's orders and regulations was blue signal protection, not the minimum safe crew size. That argument too finely slices the subject matter of the federal regulations. The FRA considered whether a lone engineer could safely conduct hostling and helper service without blue signal or some other additional protection; it concluded that he could. Wisconsin argues that in deciding that these

lone engineer operations were safe without blue signal protection, the FRA did not decide the more basic issue of whether the operations were safe at all. This argument is too narrow. So also is Wisconsin's argument that the FRA's decision that lone engineers could safely conduct hostling and helper operations without blue signal protection merely "touches upon" rather than substantially subsumes the subject of whether one-person crews were safe for these operations. The FRA's more specific conclusion that the operations were safe without added precautions encompasses the more general one that they are safe. Wisconsin's requirement that two persons conduct these operations directly contradicts the FRA's decision that one person may do them safely. Under § 20106, Wisconsin's requirement must give way. To the extent § 192.25(2)'s two-person crew requirement applies to hostling and helper operations, it is preempted.

■ We do not reach the same conclusion regarding one-person crews on over-the-road operations, however. The plaintiffs argue that the FRA has affirmatively approved all one-person operations, but the record does not support this argument. As we just discussed, the FRA's decisions regarding blue signal protection for one-person crews showed that the agency considered and decided the issue with regard to hostling and helper operations only. The FRA's regulations and its discussion of them in the Federal Register do not show that the agency considered the issue of one-person crews in other types of operations. The plaintiffs rely on the FRA's test program of remote control devices and the statements it made to Wisconsin Central about other railroads conducting one-person operations as evidence that the FRA approves one-person operations generally. The plaintiffs seem to argue that because the FRA is aware of one-person operations and has not proscribed them, it must necessarily approve them as safe. This does not follow. Such a position gives too much weight to agency in action. The record shows unequivocally that the FRA is aware that the railroad industry uses one-person crews for some over-the-road operations. And it shows that the FRA has not prohibited this practice, although it currently has the matter under consideration. But what the record does not show is that the FRA has considered the issue and affirmatively decided not to regulate such operations. Only this sort of affirmative decision preempts state requirements. As the Supreme Court held in applying a different statute, " 'where failure of . . . federal officials affirmatively to exercise their authority takes on the character of a ruling that no such regulation is appropriate or approved pursuant to the policy of the statute,' states are not permitted to use their police power to enact such a regulation." *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 178, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978) (quoting *Bethlehem Steel Co. v. New York State Labor Relations Bd.*, 330 U.S. 767, 774, 67 S.Ct. 1026, 91 L.Ed. 1234 (1947)) (omission in original). As the Fifth Circuit put it, the difference is between an agency saying " 'we haven't looked at [the issue] yet,' rather than, as *Ray* requires, 'we haven't done anything because we have determined it is appropriate to do nothing.' " *Missouri P. R.R. v. Texas R.R. Comm'n*, 833 F.2d 570, 576 (5th Cir.1987). The record does not show that the FRA's consideration of one-person crews on over-the-road operations has taken on the character of an affirmative decision to do nothing; if and when it does, that decision will preempt § 192.25. But until it does, Wisconsin is free to require two-person crews on over-the-road operations.

■ There are a few more aspects of this case that require further discussion. The first is the preemptive effect of the FRA's Safety Compliance Agreements with Wisconsin Central. The plaintiffs relied on these agreements to show that the FRA had generally approved one-person crews. As discussed above, the agreements show the FRA was aware that some

railroads used one-person crews for over-the-road movements, but they do not show that the FRA had considered the issue of their safety and affirmatively approved these operations. This does not mean, however, that the agreements are totally without effect, as Wisconsin argues and as the district court seemed to think. The agreements showed that the FRA had taken jurisdiction over Wisconsin Central's operations in Wisconsin and had set out things the railroad could and could not do. These agreements, then, showed that the FRA had considered Wisconsin Central's operations and approved various aspects of it—including some one-person operations. Under Wisconsin's theory that these agreements had no preemptive effect, Wisconsin could prevent Wisconsin Central from doing precisely what the FRA had told the railroad it could do. The FRA, not Wisconsin, has the "whip hand" in railroad safety regulations, *Shots*, 38 F.3d at 307. The fact that the agreements were temporary and that the FRA was evaluating and revising its position does not mean the agreements are not final dispositions of the FRA's position on the operations expressly covered by the agreements. If a state could prohibit a railroad from doing that which the FRA expressly approved merely because the FRA was permitting the activity as part of an ongoing study of the matter, then the FRA's ability to make informed decisions would be severely curtailed. The FRA's affirmative decision that a specific activity should be permitted, even if just so that it can be studied, is a final disposition approving the activity. While the Safety Compliance Agreements don't have the broad preemptive effect that the plaintiffs argue for, they do "cover" the subject matter of all operations that they specifically permit.

■ We have the same view of the preemptive effect of the FRA's 1994 test program for remote control devices. To the extent the FRA approved the use of a remote control device in a particular operation with a one-person crew—apparently

the only type of crew that uses such devices—necessarily the FRA had to have approved a one-person crew for that operation. Again, the FRA's more specific conclusion necessarily had to encompass the more general conclusion. Wisconsin argues, and the district court seemed to agree, that because the test program did not apply to all railroads it had no preemptive effect. It did not have the broad preemptive effect the plaintiffs argue for. But the FRA's decision to permit the use of remote control devices by railroads participating in the test program was an affirmative decision to allow those operations specifically covered by the program, and any state requirement prohibiting them would have been preempted. But an affirmative decision to permit specific operations is not, as the plaintiffs argue, necessarily an affirmative decision to permit all similar operations conducted by railroads not part of the test program. We cannot definitively state what preemptive effect the remote control test program—which is apparently no longer being conducted—would have had on a two-person crew requirement because the record is unclear as to exactly what types of operations were involved. To the extent they were hostling or helper operations, its preemptive effect on a two-person crew requirement is irrelevant because other regulations specifically approved those operations. All that is certain is that to the extent the FRA decided to permit a particular activity as part of the test program, that decision preempted any state requirements on that same subject matter. But as noted, this record does not demonstrate exactly what that extent was.

In response to Wheeling & Lake Erie's request for waivers of certain regulations to conduct remote control operations, the UTU filed a petition for an emergency order banning all remote control operations and the FRA denied that petition. The *amici* argue that this denial was an affirmative decision that remote control operations were generally permitted and, necessarily, that one-person crews were as

well. But the record does not give any details about the FRA's deliberations leading to its conclusion to deny the UTU's petition. It is unclear what conclusions the FRA reached in making that decision. Thus, as this record stands the denial of the petition does not necessarily mean that no regulation was appropriate.

In sum, § 192.25's two-person crew requirement is preempted for hostling and helper operations. It is also preempted to the extent the FRA through agreements with Wisconsin Central expressly permits that railroad to conduct one-person crew operations.

## C. The Severability of § 192.25

▮ We have held that nearly all of § 192.25 is preempted by federal regulations and orders. The only part remaining is the two-person crew requirement for operations that are neither hostling nor helper service. On appeal, the plaintiffs argue that the statute's provisions are not severable, and so in preempting part we should invalidate the whole. This issue seems not to have been raised in the district court, but neither Wisconsin nor the UTU argue that this issue was waived so we will address it.

▮ Whether invalid provisions in a state law can be severed from the whole to preserve the rest is a question of state law. *Leavitt v. Jane L.*, 518 U.S. 137, 116 S.Ct. 2068, 2069, 135 L.Ed.2d 443 (1996); *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 506, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985). Both *Leavitt* and *Brockett* involved statutes that were partially invalid because some of their provisions were unconstitutional. We have found no case addressing the severability of a state statute that was partially preempted. We assume for purposes of deciding this case that state law would also govern this issue. Wisconsin's severability law was created by statute:

The provisions of the statutes are severable.... If any provision of the statutes or of a session law is invalid, or if the application of either to any person or circumstance is invalid, such invalidity shall not affect other provisions or applications which can be given effect without the invalid provision or application.

Wis. Stat. § 990.001(11). "The factors to consider in deciding whether a statute should be severed from an invalid provision are the intent of the legislature and the validity of the severed portion standing alone." *In re Hezzie R. (State v. Hezzie R.)*, 219 Wis.2d 848, 580 N.W.2d 660, 665 (1998) (quotation omitted). Section 192.25 (3) provides that subsection (2) of the statute, which contains the two-person crew requirement, shall not apply to the extent it is contrary to federal regulations. This provision of course has no practical effect because the Supremacy Clause of the U.S. Constitution makes the statute apply only to the extent it does not conflict with federal law. But it does evidence a legislative intent to keep whatever part of subsection (2) was not preempted. It does not, of course, expressly show an intent to keep a part of subsection (2) when subsection (1) had also been preempted. But we think the intent is clear enough and the purpose of § 192.25 is not thwarted by federal preemption of subsection (1). Although the state requirements for crew qualifications are ineffective this does not mean that any miscellaneous person could operate a train in Wisconsin. Subsection (1) is preempted precisely because the FRA has covered the subject matter of crew qualifications with its extensive regulations. Indeed, the Wisconsin legislature merely adopted the federal standards for engineers and its standards for trainmen are compatible with the federal requirements and certainly less extensive. Thus, we conclude that the remaining parts of § 192.25 can be given effect without the preempted parts, and that the legislature so intended. We therefore decline to strike down the statute in its entirety.

## III.

In conclusion, the qualification requirements for locomotive engineers in

§ 192.25(1)(a) and for trainmen in § 192.25(1)(b) are preempted.. Section § 192.25(2)'s requirement that a locomotive engineer be at the controls of a locomotive anytime it moves is also preempted. Section 192.25(2)'s two-person crew requirement is preempted for hostling and helper movements. It is also preempted to the extent that one-person operations are the subject of a Safety Compliance Agreement between Wisconsin Central and FRA. Finally, the preempted portions of the statute are severable from the rest so that those provisions not preempted may stand on their own.

The judgment of the district court is therefore AFFIRMED IN PART and REVERSED IN PART.